Good morning, Your Honors. May it please the Court, Nathan Shaman and Jeffrey Lake for Appellant and Plaintiff Sarah Lowry. Just a moment, Your Honors. Your Honors, this is a section 1983 case involving an innocent victim who was bitten in the face by a police services canine. The sergeant who handled the canine in this case actually said that the dog could have ripped her face off. There are a couple themes that permeate this case in the summary judgment posture. First of all, the district court ignored the repeated pronouncements from the Ninth Circuit that summary judgment is to be used sparingly to adjudicate reasonableness in section 1983 cases. Additionally, there were a number of evidence disputes that were clearly in play at the trial court level. The trial court essentially ignored the plaintiff's evidence on those disputes and found undisputed facts. Do you agree that under Scott, the question of reasonableness is a question of law for the judge and that if there are no material questions of fact, the court could and should determine reasonableness on summary judgment? Certainly, if there were no undisputed material facts, then the question of reasonableness, Your Honor, would become a question of law. I don't dispute that. The problem in this case is that there are a number of very significant material disputes that permeate the facts. What are the significant material disputes that affect the outcome? To set this up, we had police that responded to an alleged burglary alarm. Is there any doubt that there was a burglar alarm? What was that, Your Honor? You say alleged. Is there any disputes to that? I don't dispute that, Your Honor. Part of the problem here is that you can nominally dispute everything, but I don't think there is any dispute about the fact that a burglar alarm was triggered. Let's stick to facts. There's a burglar alarm. Three officers respond with a civilian as a ride-along. They scale a locked gate to go up to a landing, and that's where we have our first dispute. The officers all testified that the door to the suite, in this case, was open. My client specifically testified in her deposition that she had left the suite to go to the bathroom, and that when she came back, the door closed behind her. Why is that dispute material? The dispute is material because it goes to whether it was reasonable for the officers to release the canine into the suite. So when they arrive on the scene... What do you mean? If it were closed, it wouldn't be reasonable, but if it's open, it is reasonable? Is that what you're saying? Part of our assessment of the facts is that the officers never actually gave canine warnings in this case. Well, what I want to know is why is it material, whether it's open or not? We'll accept your version of the fact. The door is closed. The one that may have a little more meaning is the warning question, and your argument appears to rest on the proposition that there was no warning. What was the state of the evidence on that question? So each of the officers said that there were two canine warnings given. My client states that she never heard any warning. That's not the same thing, is it? Because your client had had five vodkas and was asleep. So the fact that she didn't hear anything doesn't tell us that there wasn't a warning. It lends to an inference that there wasn't a warning. It may not be the strongest evidence in the world, but there's no evidence that my client was actually under the influence at the time they arrived. There's evidence that she had drinks, but there's been no expert evidence ever submitted that she was actually under the influence. Did she ever say she routinely slept on the couch like that? No. Not a tough inference. It's certainly not as difficult as an inference that she would be able to say whether or not there was a warning if she was asleep on the couch. The problem, Your Honor, is that the officer, Sergeant Nolan, the one that gave the warning, is standing in the door in the entry to the suite when he gives the warning. That's what he says. The office where she's asleep is almost directly adjacent to that. There essentially is no reason. He's yelling. He says he's yelling these warnings in, and she hears nothing. I think it's reasonable to infer that if somebody is asleep near where a police officer is yelling warnings, that that's going to arouse them. Here, nothing happened. What hour was this when this occurred? I believe the police arrived on scene around 11 p.m., Your Honor, so it would have been around 11 p.m. All right, so let's say the police did not give a warning. What does that do to the case, at least to the district court decision? It's clear from Ninth Circuit precedent that one of the hallmarks of reasonableness for using a police K-9 is to give it. Let's say one of the factors, the hallmark. Well, one of the primary factors, yes, Your Honor, that makes it reasonable is that a warning is given that the K-9 is going to be released to give the suspect or other person present the opportunity to present him or herself to avoid contact with that K-9. So, of course, if the warning is never given, that person isn't given that opportunity, and it's a much more dangerous use of force than if a warning is given. Well, even if a warning is given, could it still be an unreasonable use of force to release a K-9 in that situation? I believe in these circumstances it would be, Your Honor. We have what is now classified in California as a misdemeanor offense. It was a felony at the time. It's commercial burglary. There's no signs of forced entry. There's no evidence of any exit route. How did the policemen open the door? So when they arrived at the scene, there's a metal gate that surrounds a stairwell that goes up to the second floor landing. They had to put a ladder up against it, scale it, and then one officer went down and opened the door and let the other officers in. So either that's what that person would have had it done, which would have been pretty obvious in public, and this is a pretty well-traveled area in Pacific Beach, San Diego, or they would have had a key. So there's no signs of forced entry. There's no entry points anywhere else in the building. Well, the door itself is unlocked once they get to it. Is that correct? That's how the police enter the building itself. On the second floor? On the second floor. Well, their claim is that it was already open. And your claim was it was closed, but they obviously got into it. The police didn't force an entry. That's true. So either the door was open or it was unlocked. That's correct, Your Honor. It would have to be one or the other. So there's no signs of forced entry in any event. There's no information to suggest that anybody dangerous is actually present on the scene. Well, you've got a burglar alarm that's gone off. True. So you have reason to suspect that somebody may be there. Indeed, my house was burglarized once. The cops came, didn't see anything, and left, and then the alarm went off again because the burglar was inside when the police came. That happens. So it's night. They've got reason to think there's a burglar. The alarm has gone off, reason to suspect there's somebody inside, and they know nothing about that person. They don't know whether he's dangerous or not. So how do we have as a given it's not a serious crime, it's just a misdemeanor, and there's no risk? The problem, Your Honor, is that, first of all, this is not in a home. It's in a commercial setting. Where somebody turns out to be sleeping. That's true, Your Honor. It's not uninhabited. I think this case really highlights the problem with the fundamental reasoning of, well, it must be somebody that's armed and dangerous, which is how police enter these situations. Here is an innocent victim that works in the office. So it's not always somebody who's armed and dangerous. There can be innocent people present. Is it required that there always be known danger before the police can release the dog? I believe that one of the factors in determining whether to release the dog is the threat to officer safety and the severity of the crime, both of which have to have some articulable basis. And in this case, all the police know is that a burglary alarm has been triggered. That's it. They have no other facts. One question probably is not material or relevant. Are there offices on the first floor as well as the second floor? Not on this side of the building, Your Honor. And I'm pretty sure this is in the record, but I'm not positive. I believe it's storage areas. But the offices are only on the second floor. Thank you. I just wondered whether there was always concentration on the second floor. All right. So the point that I'm getting at here is when police assess reasonableness, they're expected to use articulable facts. Well, there's probable cause, reasonable suspicion, use of force. There have to be facts present. And here, they know there's been a burglary alarm. In our version of facts, there's no forced entry. There's no open door. There's nothing to really indicate that there's a dangerous situation present. There is something to indicate that maybe there's an unlawful person present. But that's all they could potentially really presume from that. The bottom line is that commercial burglaries occur all the time under nonviolent circumstances and violent circumstances. So presuming that this person is armed flies in the face of a lot of the scenarios where that wouldn't be the case. This is not a home invasion. The other problem is that one of the facts that we dispute is that when the officers arrive, when they're on the second floor landing, there's a window that looks in over the office. Now, the officers say they're trained not to silhouette themselves so they didn't look in there. I can't second guess them, obviously, in hindsight, in terms of the exact circumstances. But we know that there's recessed lighting that would have been shining into that office and they could have seen Ms. Lowery on the couch. They say they never did. But we know that at least was possible. But wouldn't the recessed lighting highlight exactly their problem? If the lighting is coming from behind to look in the window, it means you're silhouetting yourself in the window. I agree. So, again, I'm not second guessing them. I'm just saying the possibility was at least there. Another really important point that I want to make here is that all of the precedents that have been relied on by the district court in its decision and by the city of San Diego in its answering brief are cases dealing either with qualified immunity or dealing with clear error analysis of a district court judgment. We're here on summary judgment. So it's not a matter of whether it was clearly established federal law at the time. It's not a matter of whether the district court clearly erred in some factual assessment. All we have to do at this point is create factual disputes. And the Ninth Circuit has repeatedly made clear that these are cases that should almost always end up in front of a jury when it comes to the reasonableness inquiry. Here? No, wait. I thought you said that if there's no factual dispute, it doesn't go to the jury. Right, but we're claiming there is a factual dispute. If there's a factual dispute, material factual dispute, you're saying that should go to the jury. That's correct. Okay. So your position is on this record there's a factual dispute, so what's the remedy you want? So the remedy, Your Honor, would be to reverse the decision, vacate the summary judgment, and remand for the case to proceed to trial. The overall problem here is I think that there's a complacency that's occurred with the use of police canines and what's appropriate with the use of police canines. And I think this case really highlights the problem that can occur with using them. All the cases that I've researched from the Ninth Circuit have always dealt with a suspect, some criminal suspect who ends up actually having committed a crime. But here we have a case on Foyt where we actually have an innocent person that gets caught up in this. Now, yes, she triggered the burglar alarm, but she was there lawfully, and she did end up with a significant injury, and she was very traumatized. But that's retrospective. I mean, the police approaching the building can't know what they're going to encounter in the building, and the law makes clear we're supposed to take an objective view from their perspective of what they know at the time. That's true, Your Honor. But the problem here is that the San Diego Police Department utilizes the bite-and-hold policy, where the dog goes in and it's going to bite and lash onto the first thing that it sees. And this case highlights the need to revisit those principles. There is another policy that was talked about in expert testimony called bark-and-guard, where the dog finds the suspect and alerts the officers to the presence of the suspect but doesn't bite that person. This is a perfect scenario where that would have prevented an injury to this person but still would have created a safety barrier for the officers to know that somebody was actually present. Is there anything in the record as to how serious the injury was? It was a laceration to her upper lip that required three stitches. Three stitches? Yes, Your Honor. Because the district judge refers to it as either the dog scratched her a bit, like it was not very serious. The testimony from my client at her deposition is that the dog bit her upper lip. She, in part, relies on the fact that she specifically remembers the breath of the dog on her face. And I want to emphasize that Sergeant Knowlton, who is the handler, specifically stated that if he hadn't called the dog off, it would have ripped her face off. That's the problem here. Now, that raises another question. Is that something else we should consider in the reasonableness of the use of force, that is, that the handler had the ability and apparently successfully exercised his authority in this situation to almost immediately call the dog off? That is potentially true, although an injury did occur. And my point is that the separation between the time where her lip gets lacerated and her face gets ripped off could have literally been seconds. And do we want to vest that discretion in an officer to use that level of force against somebody in a commercial burglary setting? That, I think, is a jury question, ultimately. May I ask you one more question? Judge Teshima asked what you wanted, and you said you wanted material issues of fact to be sent to a jury. If there were no material issues of fact, and you prevailed on all of those issues, are you then asking for any relief? And if so, what? In other words, if the issues of fact that are disputed were all found to be non-material, what would your request be in that case? In that case, Your Honor, basically what we're left with is, is it reasonable for the police to use a canine in a commercial burglary setting where warnings are given? That would assume no dispute. And I still think that there's a question for the jury of whether that overall scenario is reasonable. There has to be a dispute there. Why is that for the jury? If there are no disputes of fact, then Scott says that the question of reasonableness is for the court. It used to be for the jury in this circuit. The problem is that the overall question of is it reasonable is still a question of fact. Even under Scott? I believe under all the Ninth Circuit President, Your Honor. You can't. But does Scott trump? Scott's a Supreme Court case. Well, that's okay. I mean, we can look at that. Mr. Chairman, clear something up for me. I thought, is there something in the record about the difference in which the San Diego police use these dogs where it's a residential intrusion as opposed to commercial? No. Or is it exactly the same? It's the same, but actually the — Wouldn't there be some testimony, well, we wouldn't do that at a residence or something like that? Sergeant Knowlton actually specifically said in his deposition that they would release the canine into a house, and if a child was asleep in his or her bed, the dog would attack the child. They do not make a distinction between those scenarios. Okay. Thank you, Your Honor. Good morning, Your Honors. Stacey Plotkin-Wolf on behalf of Pele, City of San Diego. To answer your question about the — that Your Honor, Judge Tashima just asked regarding the policy of releasing dogs into residences, the policy does not hold what was just indicated. The policy says that the officers are to clear the residence first before sending in a dog. So they would yell out that they're there, they have a police dog, come on out, and the innocent people who were able to come out would come out. That is what is supposed to happen here. That's not — Or anyone who didn't hear the warning, for whatever reason. The officers would spend more time trying to clear a house, but that's not what happened here. We're not talking about — I'm not talking about what happened here. I'm just asking about Judge Tashima's question. Right. You would make an effort at a residence, a greater effort at a residence, than you would at a commercial place. Is that the answer? Yes, especially at 11 o'clock at night where there was no reason to expect that there were people there. It was a dark commercial — You don't have to make an argument. I'm just asking what the fact is. And the fact is that at a residence, you would make a greater effort to make certain that there was nobody there, although if somebody had had five martinis or whatever they were, five vodkas, I think, if somebody had had five vodkas and was asleep at his residence, maybe he wouldn't hear the warning either. That's true, Your Honor. And, unfortunately, we can't protect against everybody who has had five vodka drinks and passed out on the couch. Well, I guess we better tell people in San Diego how many drinks they can have, even in their homes, to pass out. Well, not necessarily, Your Honor, because they do take extra effort, and I believe when we're talking about a commercial situation such as what we have before us, we have somebody who's there at 11 o'clock at night on a Thursday evening who set off a burglar alarm. We better not tell our law clerks about this. At least don't tell Judge Kaczynski's. About the alarm or the vodkas? Well, hopefully they wouldn't be setting off burglar alarms, Your Honor. Well, you can hope that. I can't remember what the false rate of burglary alarms is in Los Angeles, but I know it was a very serious problem that we had so many false burglary alarms that they had to change the systems, and they still do, and they impose fines on the burglary alarm companies because they're regularly going off falsely. Right. Unfortunately, in this case, we did not have a false burglar alarm. We had somebody who actually did set off a burglar alarm. Just a non-burglar burglar alarm. Well, Your Honor, but the police officers didn't know that. There is one fact I'd like to focus on, and that is the warning. If, in fact, suppose we take plaintiff's version and say that no warning had been issued, wouldn't there be a problem with regard to the reasonableness of releasing the dog? I don't think we can take that. I understand that. I'll come back to that. But start with the proposition that we find as a fact that there was no warning. At that point, wouldn't there be a problem with the reasonableness of the dog release? I really don't think so, because in this situation, under the ground factors, what we have here is a very minimal use of force with only a scratch or a nip. Well, even the district court called it more than minimal. Right. I understand that. But I do think it was minimal. But at most moderate. We have just a three-inch. But don't you consider not only the actual injury, but the potential for injury? Yes, Your Honor. The manner in which the use of force was deployed. And in this situation, Sergeant Knowlton followed very closely behind that dog so that he would be in a position to call the dog off, should he. And he did say you're lucky that your face wasn't ripped off. Yes. In hindsight, he probably shouldn't have said anything at all. Well, no, because that's not helpful for liability. But other than that, it's a fact. Of course not. But he was right behind the dog. And because of the way the use of force was deployed, that didn't happen. What happened was, as the dog was jumping, Officer Knowlton saw that there was a form on the couch, called the dog off. But, of course, the dog in midair couldn't stop, landed on the lump. And bit him bitter. Potentially. We don't know that for sure. Even if you look at the plaintiff's deposition transcript, what she says is that she thinks it bit her because she was able to feel the dog's breath on her face. We don't know if that was it. And she needed three stitches. I'm sorry, Your Honor? And she needed three stitches. She did. And that could have just been a scratch from the paw. We don't know. A scratch from what? The dog's paw. We don't know because there wasn't an oppositional bite.  There's no bite on the bottom. That's in Dr. Polsky's deposition transcript. So there is the issue whether she was scratched or bitten. But regardless, it was only three stitches required. And she didn't even want medical treatment at the scene. The officers had to talk her into it. Yeah. You know, to decide a case like this, on the extent when the dog gets in your face so you can feel his breath on your mouth, the question of how badly he would bite, such milliseconds of calling him off, and how he can stop and where, should that really determine the outcome of the case, whether he succeeded in getting a real bite or only a partial bite? According to the ground versus Connor factors, yes. We do have to look at what the severity of the constitutional intrusion was. Yeah. But, I mean, you said including the potential. I mean, you take a shot at somebody without any reason it's excessive force. It doesn't matter that you miss him. It's still excessive force because it has the potential. Right. I mean, we don't say, well, it didn't actually hit him, so there was no injury. Which is why I think that the district court came down on the side of finding moderate force rather than minimal force. This wasn't a severe force case like two versus Gates or Miller versus Tacoma. This was, or not Tacoma, Las Vegas Metropolitan. Okay, Miller's good enough. Sorry. So I think that's where the district court came down on moderate. But if you look at the other ground factors, the severity of the crime and the risk to the officers, those are all strongly on the government's side here. We have a crime which was commercial burglary, which at the time was considered a felony. And according to both California law, this court's precedents and the United States Supreme Court's rulings, burglary is a felony and an aggravated felony. For immigration purposes. Well, under the ACCA, Your Honor, is that what you're referring to? I'm talking about California. If you look at U.S. versus Alcala versus Sanchez, they talked about it being an aggravated felony. We've got the Sandoval case, which came down after that. We can give you misdemeanors that are aggravated felonies if you're looking for immigration law. Well, if you look at the Sandoval case, which came down after the briefing was submitted in this case, it came down in February of 2014. In that case, it said the officers may assume that burglary suspects will flee or use armed resistance, that's fronts. And in Sandoval, that burglary and attempted burglary have an inherent risk of violence. And that's what our officers were facing that night. Well, I don't want to give you a course, but suppose a burglary suspect did flee. Does that mean you can kill him? Of course not, Your Honor. Okay. So the fact that he may flee doesn't mean you can use whatever that term is. Deadly force. Deadly force, right. Of course not. And nobody has suggested in the briefing or at the district court that this is a deadly force case. But do you think you can use severe force? That would depend on the circumstances. Here we're not looking at a severe force case. Do you ever heard of a hypothetical question? Yes, Your Honor. Okay. I'm not asking you what we're looking at here. I'm trying to pursue a line of inquiry so we know what kind of a disposition we can make. Should we write an opinion even beyond this case? Anyway, why don't you talk about the disputed issues of fact? I would like to come back to that. I posed you a question accepting a certain fact. So let me go back to the district court concluded or stated that it was undisputed that the sergeant gave warnings and that her contrary statement was immaterial. Is that really the case? Suppose a jury came back here with a verdict in favor of a plaintiff. Would you be able to overturn that based on a finding? Would you be able to challenge a factual finding by the jury that in fact no warning had been given? Suppose they had been given a questionnaire and they said no warning given and the evidence was as has been described. I think we would have a hard road ahead of us to try to dispute that, Your Honor. Because once a jury makes a finding, it's much more difficult. Wasn't summary judgment, at least in theory, supposed to be the same thing? Yes and no. I mean the judge first had to make evidentiary rulings, and in this case he made the evidentiary ruling that the plaintiff lacked foundation to make the kind of statement that she was trying to make that there had been no warnings given. So you took immaterial and maybe as being not admissible evidence because she didn't have a basis for it. Exactly. And that's where we were in this case. Now, answering Your Honor's question. But she could say she didn't hear the warning. Could a jury draw an inference from that that there had been no warning? I suppose anything is possible, but I don't think it would be appropriate. Well, that's not helpful. I can't really answer that. Could they? Could a reasonable jury do it? I don't think a reasonable jury could. Based on three officers testifying that the warnings were given loudly, that the officer waited 30 to 60 seconds in between the warnings and then deployed the dog. Could a reasonable jury disbelieve police officers when they describe the circumstances of an arrest? Some officers. These officers, no. I don't know what principle that is. The jury has an opportunity to look at the officers as they're testifying and determine their credibility. And in those circumstances, juries may not believe what an officer says. But I don't think that that would happen in this case. But I know the officers and you don't. Neither does the jury. Well, the jury would at that point. I think that's not a legal principle that these three officers are so credible because you know them. I think most prosecutors in good faith believe that their police officers are telling the truth. And I hate to say it, but it does happen on occasion that they're not. And it may not be the usual case, but it is a question for a jury. We don't go into a trial saying you have to believe them because they're police officers. Well, it may or may not be a question for the jury whether or not they made these warnings because the plaintiff doesn't have foundation to give that kind of testimony. Well, she can say she didn't hear it, and my question to you was, could a jury draw an inference from the fact that she said, I was right next door and I couldn't hear it, I was asleep. If they had yelled three times, forget she doesn't have to say that, she can just say, she'll say, I was right next door, I was asleep, I didn't hear it. Could the jury from that draw an inference, a reasonable jury, draw an inference that they, having heard the officers, that they don't believe the officers did it and they believe she would have heard it? In a vacuum, yes. In the circumstances in this case, I don't think a reasonable jury could because you have a woman who had five vodka drinks, who had passed out on a couch, who, when she fell asleep, said she was able to hear traffic, people walking on the street outside, but yet didn't hear the officers when they scaled the fence, didn't hear the officers when they were walking along the terrace, didn't hear the officers when they were checking the doors, didn't hear the officers talking to each other, didn't hear the officers open the door to her suite. Obviously she wouldn't have heard anything at that point. I think that's a good jury argument. Ms. Plotkin-Wolf, I gather your position is that the material facts are uncontroverted. Yes, Your Honor. And based upon, I'll call them the legal inferences or conclusions, you draw from those facts, the district court's judgment should be affirmed. Yes, Your Honor. Now, suppose we agree with you that the record is there are no material facts in controversy. In other words, the facts necessary to decide this case as a matter of law are in the record. But if we disagree with you on the conclusion to be drawn from those facts, could we not only reverse the grant of summary judgment to the defendant but enter summary judgment for the plaintiff? I don't believe so, Your Honor. Why not? I think you could reverse, but I don't think the question before you, there's no summary judgment motion pending from the plaintiff. So the court of appeal cannot grant summary judgment to one party unless that party has made a motion for summary judgment? I believe so, Your Honor. If you're wrong on that. I'm sorry? I said if you are wrong about that, and if we did have the authority to grant it, would we be required to because there were no issues of material fact, so somebody's got to win on summary judgment. I think under the Scott case, Your Honor, it's a question of law, and it's something that the court has to decide if the issue is before the court. Okay. Thank you very much. Before I sit, however, I do want to discuss whether the constitutionality of the policy itself All right. You're over a minute over, but we'll give you another minute. Go ahead. There was an argument that the bark and guard policy should be used instead of the bite and hold policy, but there has been no showing of My brain just went off on me. There's been no showing of deliberate indifference with regard to the policy. We have no showing that there is an obvious need for different action taken in this or any other case, and that is required showing in order to find a policy was the nexus for an unconstitutional act. Wait a minute. Are you saying in any policy case, plaintiff has to show deliberate indifference? The plaintiff was claiming that the policy itself was unconstitutional in this case. Right, but that doesn't mean the plaintiff has to show deliberate indifference, does it? No, only if there's a facial challenge, and that was one of the claims that the plaintiff was making. I'm sorry if I didn't make my argument clear. You mean if there's a facial challenge, the plaintiff has the burden of showing that the agency, the municipality, was deliberately indifferent in adopting the policy? I believe so, Your Honor. What's the case you rely on? Excuse me. Isn't it sufficient for the plaintiff just to show that the policy was the moving force for the violation? Yes, if this court were to find that there was a constitutional violation as the way the force was used in this case. And there's no need to show deliberate indifference? Correct. I've never heard of a bark and hold policy. I mean a bark, is that what it's called? Bark and guard, that's where the dog goes in and barks at the suspect until the officer arrives or the suspect makes some kind of movement that makes the dog bite. In that case, what you're relying on is the dog to make the decision whether to bite or not, and that's probably not a good idea. I don't understand. I mean, that sounds like a pretty good policy to me. Instead of just biting. Well, they bark until the suspect makes any kind of movement such as, oh my gosh, there's a dog here, and then they bite. And you think it's better to have them bite automatically? Well, what we do is we have the officer, as what happened in this case, the officer followed the dog very closely so they can call them off. In a bark and guard situation, you send the dog in, you're waiting at the doorway, and that dog could be biting somebody for a minute before you get there, and as the court saw in the Miller case, a minute can cause very severe injuries. That's interesting. All right. Thank you. Your Honor, if it pleases the court, may I have a brief rebuttal? Yes. Both sides have gone over, but we'll give you a... Okay. I will try to be as... No more than two minutes, no matter what. Okay. I will pass. Good morning, Your Honor. This may please the court. My name is Jeffrey Lake. I am co-counsel with Mr. Shaman for Ms. Lowry in this case. A couple things I just wanted to point out very quickly as we went through the issues. First, to the last point that was made about deliberate indifference, I think that's addressed by the Eighth Amendment, and that does not need to be shown. You asked for a citation. I think that's where it's covered. Secondly, there was some discussion about the Scott case, and whether or not, in light of Scott, reasonableness was a question of law that needs to be determined by the court, or as opposed to a question of fact that needs to be determined by the trier of fact, I would just point out to you that Scott was a qualified immunity case, and this case is not. Therefore, when you were applying your analysis... You looked at the footnote in question in Scott? Yeah. Do you think it turns on being qualified immunity? Well, I think that this could be distinguishable because this is not a qualified immunity case. Are you going to tell Justice Scalia that? He doesn't talk about qualified immunity at all in that footnote. No, that's true. If I had an opportunity to present to Justice Scalia, I would be thrilled, but that may be another day and another matter. May I have another opportunity after this? It says the reasonableness of Scott's actions is a pure question of law. I don't see qualified immunity affecting that in the slightest. I was just pointing it out as a qualified immunity case. Well, it's a distinction you want to offer up, and it makes it different, but I don't know that it's a difference. Right. Okay. Which actually leads me to the next point that I wanted to address with you, which is two things. You asked a question about whether or not a commercial setting and a residential setting are the same or they're different and how they apply to the standards of a constitutional use-of-force policy and whether or not reasonableness, which is the question of fact that we are discussing today and what the controverted facts are that apply to that. I wanted to read you just one line from a deposition that I took of Officer Knowlton, and I asked him that same line of questioning around commercial versus residential, and this is on September 15, 2010. I asked him when he came in, so it's just silent. Let's say you yell. This is at a residence. You don't hear a response. You hear no response, no footprints, no barking, anything. As far as you know, he answers, release the dog off the lead. Question. So if the dog then goes into the house, at that point it knows whoever it finds, it bites them? Answer. Yes. Question. By me. So if it goes into a bedroom and there is a young child asleep or if there is a burglar standing in the kitchen with a butcher knife, it doesn't know to make a differentiation. It goes after the first person and it bites. Answer. Correct. Now, that is the policy of the San Diego Police Department. It does not matter if it's a burglar with a butcher knife or a baby in a bassinet. It does not matter if it is a residential home or a commercial setting. If they have reason to be there, they're going to release the dog, which means then whether or not the facts, as they are taken in their totality in this case, can be deemed as reasonable. And I will submit one very, very important fact, and that is that this entire time when the police came to the building, and by the way, I think you had a question of its layout. It's a commercial building on the bottom, parking lot in the back, office buildings on the top with two stairways that go up and a catwalk, and the buildings face out over the catwalk. At the bottom of the stairs there are two large metal gates with bars that point out. When they arrived at the scene, both of those gates were locked, and they conjugated in the parking lot and decided what to do. What they decided to do was send an officer over, unlock the bottom gates. They all went up the stairs together. They went along the catwalk. They determined that the door was either open or unlocked. They opened the door. They released the dog. They followed the dog inside, and Officer Knowlton and the civilian ride-along both testified in the police reports and in the deposition of Officer Knowlton that they saw the dog jump onto Ms. Lowry and that he was immediately pulled off. The reason that is so important is because the civilian ride-along saw it too. He was standing right there with them in the parking lot, over the fence, up the stairs, along the catwalk, into the office, and saw the dog attack. And, by the way, there was a question about the severity of the injury. Does two minutes mean anything to you? Okay. It doesn't. I will stop if you would like me to. Well, you can finish the sentence. Okay. Thank you. The conclusion of the sentence was the severity of the injury, and that is that she was also injured on her back and buttocks from the feet of the dog and on her face where the dog hit her. So if the dog's feet were on her back, its face was in her face, it's a bite. And not only that, we're talking about potential injury. It caught her in the lip. There's nothing on the bottom. But what it could have done is missed her lip and caught her neck. It was within two inches. Okay. Thank you, counsel. Thank you very much.
judges: Reinhardt, Tashima, Clifton